USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/2/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                     :

ALTA PARTNERS, LLC,             :

                              :

                  Plaintiff,    :          1:23-cv-7974-GHW

                              :

            -v-                :     MEMORANDUM OPINION &
                              :             ORDER

SUNCAR TECHNOLOGY GROUP, INC.,   :

                              :

                Defendant.   :

                              :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

## I.     INTRODUCTION

Plaintiff Alta Partners, LLC ("Alta") purchased and then attempted to exercise warrants to purchase shares in Defendant SunCar Technology Group, Inc. ("SunCar"). When SunCar refused to allow Alta to exercise the warrants, Alta commenced this action for breach of the warrant agreement (the "Warrant Agreement"). Under the Warrant Agreement, the warrants were exercisable only after completion of a business combination involving SunCar and only once there was an effective registration statement and prospectus covering the shares issuable upon exercise of the warrants. Alta contends that SunCar breached the Warrant Agreement's "best efforts" clause (the "Best Efforts Clause") because its conduct in preparing and filing a registration statement covering the shares was insufficient to satisfy its obligation to use best efforts.

SunCar moved for summary judgment, contending that it did not breach the Best Efforts Clause because it did "everything within its power" to begin the process of filing a registration statement registering the warrant shares within the thirty-day window set forth in the Best Efforts Clause and contending that Alta cannot prove damages. Because, among other things, SunCar's attorneys did not conduct any research into whether it could have registered the warrant shared on its Form F-4, because SunCar failed to follow up with its auditor to ensure the timely completion of

the 2022 audits, and because SunCar's attorneys billed less than ten hours total to the matter number for the filing of the Form F-1, a reasonable jury could find that SunCar did not use best efforts to effectuate filing of a registration statement registering the warrant shares via either the Form F-1 or the Form F-4.  Accordingly, because summary judgment is not appropriate on this record, SunCar's motion is DENIED.

## II.    BACKGROUND

### A.  Facts[1]

#### 1.  The Parties

Plaintiff Alta is a limited liability company.  Dkt. No. 101 ("Def.'s 56.1") ¶ 1.  Alta "exists to trade its principal Steven M. Cohen's personal money."  *Id.* (citation modified).  Steven Cohen is Alta's sole member, owner, and decision-maker.  *Id.*

Defendant SunCar is a Cayman Islands company with its principal place of business in Shanghai, People's Republic of China.  *Id.* ¶ 2.

#### 2.  The Warrant Agreement

Goldenbridge Acquisition Corporation ("Goldenbridge") was a special purpose acquisition company or "SPAC"[2] that went public on March 1, 2021 through an initial public offering ("IPO"). *Id.* ¶ 3.  During the IPO, Goldenbridge issued warrants, which were governed by the Warrant Agreement.  Def.'s 56.1 ¶¶ 4–5; Dkt. No. 103-3 ("Warrant Agreement").  A "warrant"[3] is "a type of security that grants the holder the right, but not the obligation, to buy or sell an underlying share of

---

[1] The facts are drawn from Plaintiff's amended complaint, Dkt. No. 40 ("AC"), the parties' Local Rule 56.1 statements, Dkt. No. 101 ("Def.'s 56.1"); Dkt. No. 106 ("Pl.s' 56.1"), and other documents submitted in connection with Defendant's motion for summary judgment.  They are undisputed in relevant part unless otherwise noted, and where disputed, the Court resolves all ambiguities and draws all permissible factual inferences in favor of Alta, as the party against whom summary judgment is sought.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

[2] A SPAC is a "publicly traded company that holds cash in trust for its investors and exists for the purpose of identifying a non-public target company with which to enter a business combination."  AC ¶ 14.  "Following a successful business combination with a target company, investors in the SPAC become shareholders of the target company."  *Id.* ¶ 15.  This process is referred to as a "de-SPAC" transaction.  *Id.*

[3] The warrants are distinct from the shares issuable upon exercise of the warrants—the Warrant Shares.

stock at a specified price before a certain expiration date." Pl.'s 56.1 ¶ 4.  Here, each warrant "entitled its holder to purchase one-half (1/2) of one Ordinary Share" of Goldenbridge (the "Warrant Shares").  Warrant Agreement at 1.

The Warrant Agreement set forth the terms for a registered holder to exercise its warrants. Section 3.2 of the Warrant Agreement provided that the warrants "may be exercised only during the period . . . commencing on . . . the completion of [Goldenbridge's] initial business combination . . . and terminating . . . five years" thereafter.  Warrant Agreement § 3.2.  Cash exercise was available "only during such times that there is an effective registration statement registering the Warrant Shares, with the prospectus contained therein being available for the resale of the Warrant Shares."  Warrant Agreement § 3.3.1.  The Warrant Agreement set the exercise price "at $11.50 per full share."  Warrant Agreement § 3.1.  And the Warrant Agreement provided for cashless exercise "if there is no effective registration statement registering the Warrant Shares on any day the Registered Holder desires to exercise the Warrants and more than 90 days have passed since [Goldenbridge] complete[d] its initial business combination."  Warrant Agreement § 3.3.2.

And at the center of the parties' dispute in this case is Section 7.4 of Warrant Agreement— the Best Efforts Clause.  Section 7.4 states—

> Registration of Ordinary Shares.  The Company agrees that as soon as practicable, but in no event later than thirty (30) business days after the closing of a Business Combination, it shall use its best efforts to file with the SEC a registration statement for the registration under the Act of the Ordinary Shares issuable upon exercise of the Warrants, and to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the Warrants in accordance with the provisions of this Agreement.

Warrant Agreement § 7.4.

### 3.  The De-SPAC Merger

Following Goldenbridge's March 2021 IPO, it "commenced a search for a target company with which to merge."  Pl.'s 56.1 ¶ 142.  After reviewing a number of candidates, "Goldenbridge

identified [Auto Services Group, Inc. ('ASG')] as its merger target." *Id.* ASG was a Cayman Islands holding company that provided certain "after-sales" automotive and insurance services through its wholly-owned, China-based subsidiaries. *Id.* ¶ 143. On May 23, 2022, Goldenbridge and ASG entered into a merger agreement, which provided for a two-step[4] business combination. *Id.* ¶ 144. Under the merger agreement, SunCar assumed "all agreements, covenants, duties and obligations" of Goldenbridge, including Goldenbridge's obligations pursuant to the Warrant Agreement. *Id.* ¶¶ 147, 153. And the merger agreement obligated SunCar to use "commercially reasonable efforts to . . . as promptly as practicable," prepare, file, and obtain an effective Form F-4 to register SunCar's ordinary shares that would be issued in connection with the merger. *Id.* ¶¶ 150, 151.

To successfully complete the de-SPAC merger and obtain an effective Form F-4, Goldenbridge retained Loeb & Loeb LLP ("Loeb"), Def.'s 56.1 ¶ 12, and ASG retained Pryor Cashman LLP ("Pryor Cashman"),[5] *id.* ¶ 13.[6] Elizabeth Chen was the lead partner from Pryor Cashman working on the matter. *Id.* ¶ 39. And Loeb's lead attorney on the matter, Giovanni Caruso "was an experienced practitioner [who] ha[d] done 'dozens' of de-SPAC deals." *Id.* ¶ 17. Mr. Caruso's boss, Mitch Nussbaum, who was the senior originating partner on the matter, was also very experienced with de-SPAC transactions, having done "many, many hundreds" of SPAC deals. *Id.* ¶¶ 34, 35. A third Loeb attorney, Viven Bai also worked on the SunCar de-SPAC matter. Mr.

---

[4] At the first step, the "Reincorporation Merger," Goldenbridge reincorporated in the Cayman Islands by merging into its wholly-owned subsidiary, SunCar Technology Group, Inc., with SunCar remaining as the surviving publicly-traded company. Pl.'s 56.1 ¶ 146. At step two, the "Acquisition Merger," step, SunCar Technology Group, Inc. merged with ASG, with ASG surviving as a wholly owned subsidiary of SunCar. *Id.* ¶ 148.

[5] The parties dispute the division of labor between Pryor Cashman and Loeb with respect to preparing SunCar's SEC filings and registering the Warrant Shares on the Form F-4 after the de-SPAC merger. SunCar contends that "Pryor Cashman was not the SPAC counsel and expressly deferred to the professional judgment [of] Loeb as the SPAC counsel" with respect to registering the Warrant Shares on the Form F-4. Dkt. No. 110 ¶ 157–59. And Alta asserts that "Pryor Cashman was also responsible for advising on which securities were to be registered on the Form F-4." Pl.'s 56.1 ¶ 157. Specifically, Alta asserts that "Pryor Cashman did extensive research into the appropriateness of registering the exercise-issuance of Warrant Shares on Form F-4 and determined that it could be done." *Id.* ¶ 23.

[6] The parties disagree as to the extent of Goldenbridge's and ASG's prior experience with, and understanding of, de-SPAC mergers specifically and United States securities law more generally. And they disagree over the extent to which the companies relied on the advice of Loeb and Pryor Cashman. Pl.'s 56.1 ¶¶ 14, 15 ("Alta disputes that SunCar and ASG has 'no in-house U.S. expertise and relied on outside counsel completely.'"), 16.

Caruso, Mr. Nussbaum, and Ms. Bai "prepared and filed Form F-4 registration statements with the SEC in connection with other de-SPAC business combinations that registered (or attempted to register) the issuance of warrant shares upon exercise of warrants" in seven other de-SPAC transactions.[7]  Pl.'s 56.1 ¶¶ 163–89.

### 4.   Goldenbridge Files a Form F-4

Pryor Cashman prepared the first draft of the Form F-4 and the fee table.  Def.'s 56.1 ¶ 24. In the first draft, the Form F-4's fee table cited fee Rules 17 C.F.R. §§ 457(g) and (i) and would have simultaneously registered both the warrants and Warrant Shares.  *Id.*  But Mr. Caruso subsequently revised the fee table—removing the statement that it was "simultaneously register[ing]" the Warrant Shares issuable upon exercise and replacing references to Rule 457(g) and (i) with Rule 457(f)(2).  *Id.* ¶ 26.  As a result, the revised Form F-4 did not register the Warrant Shares.

Mr. Caruso testified that he decided[8] to revise the fee table to not register the Warrant Shares on the F-4 because "he read the instructions on the F-4 Form to be 'clear' that post-de-SPAC warrant exercise was 'not specifically permitted' on the F-4."  *Id.* ¶ 27.  Mr. Caruso testified that, in his view, "the Form F-4 only permits registration of securities issued in connection with the business combination."  *Id.* ¶ 28.  And because the Warrant Shares here were only issuable after the de-SPAC merger, Mr. Caruso believed that "these warrants were not exercisable in connection with the business combination," making them not registrable on the Form F-4.  *Id.* ¶ 30.

That the Warrant Shares could not be registered on the Form F-4 was "so evident to Mr. Caruso that he never considered doing it any other way, and [never] [] look[ed] beyond the 'clear'

---

[7] SunCar disputes the relevance of these other de-SPAC transactions, contending that Alta provides "no explanation on how th[ese] transaction[s] [are] comparable to the SunCar de-SPAC" "[n]or does Alta present any evidence about what considerations went into registering what securities on th[e] [other] S-4/F-4[s]."  Dkt. No. 110 ¶ 164.  But SunCar does not dispute that Loeb worked on such deals.

[8] Mr. Caruso testified that he "made the decision not to include the exercise of the shares underlying the warrants" on the Form F-4.  Def.'s 56.1 ¶ 18.

instructions." *Id.* ¶ 32. Mr. Caruso never "bothered discussing," *id.*, his views as to whether the

warrant exercise could be[9] or should be registered on the Form F-4 with Goldenbridge before he

made the decision to revise the fee table. Pl.'s 56.1 ¶ 156. And Mr. Caruso decided not to revise the

fee table to remove registration of the Warrant Shares without conducting any additional research

into whether the Form F-4 permitted such registration and without first consulting with any other

Loeb attorneys—even though Mr. Caruso, "alongside [other] colleagues at Loeb prepared and filed

numerous Form F-4 registration statements . . . that registered the exercise-issuance of warrant

shares in connection with other de-SPAC transactions before, during, and after" preparing the Form

F-4 at issue in this case. Pl.'s 56.1 ¶ 27, 161–93 (identifying seven other de-SPAC transactions where

Mr. Caurso, Mr. Nussbaum, and Ms. Bai prepared and filed Form F-4s registering warrant shares);

Def.'s 56.1 ¶ 32. Instead, as Mr. Caruso testified, his view was based solely on the Form F-4's

instructional language.[10]

---

[9]      Importantly, the parties disagree as to whether, because the warrants at issue were only exercisable after the de-SPAC transaction, the Form F-4's instructional language prohibits registration of the Warrant Shares—SunCar asserts that the Warrant Shares could not be registered on the Form F-4 and Alta contends that they could have been so registered. Alta contends that registering warrants on a Form F-4 is permitted, and indeed, is commonplace in de-SPAC transactions and that Mr. Caruso's testimony that he believed the Form F-4's instructional language prohibited the Warrant Shares' registration is nothing more than a "post-hoc invented-for-litigation excuse for failing to register the issuance of the Warrant Shares upon exercise of the Warrants on the Form F-4." Pl.'s 56.1 ¶ 27.

It is for the Court to decide as a matter of law whether the Warrant Shares at issue could be registered on the Form F-4 and whether the warrants were issued or convertible "in connection with" the business combination under the Form F-4's instructional language and relevant guidance documents. The Court disagrees with Alta that this is an issue of fact inappropriate for resolution on a motion for summary judgment. The Court, not a factfinder, determines the "legal effect" of a legal document. *Cf. Liang v. City of New York*, No. 10-cv-3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013), *aff'd sub nom. Liang v. Zee*, 764 F. App'x 103 (2d Cir. 2019). Whether the Form F-4 permits registration of the Warrant Shares is "a matter of statutory interpretation, rather than a matter of analyzing a factual record." *Securities and Exch. Comm'n v. Coinbase, Inc.*, No. 23-cv-4738, 2025 WL 40782, at *7 (S.D.N.Y. Jan. 7, 2025). The parties have not submitted briefing to the Court on this issue. That said, as discussed below, the Court observes that the Second Circuit Court of Appeals recently affirmed a decision by Judge Rakoff, concluding that warrant shares issuable upon exercise of warrants after the completion of a merger can be registered on a Form F-4. *See Alta Partners, LLC v. Getty Images Holdings, Inc.*, 165 F.4th 141 (2d Cir. 2026).

[10] The parties disagree over whether the decision to not register the Warrant Shares on the Form F-4 was partly attributable to external factors, namely "an urgency" in effectuating the Form F-4 because of increased scrutiny over SPAC transactions and China-based securities issuers that could have permanently foreclosed completion of the de-SPAC transaction. *See e.g.*, Def.'s 56.1 ¶¶ 39–40. Alta contends that "the only basis for Goldenbridge's purported decision not to attempt to register the Warrant shares on the Form F-4 was that [SunCar's] counsel allegedly did not think it was permissible to do so," and that any of SunCar's alternative justifications for not registering on the Form F-4 are, again, mere post-hoc rationalizations invented for litigation. Pl.'s 56.1 ¶ 48.

On July 9, 2022, Goldenbridge filed its Form F-4 with the SEC. *Id.* ¶ 45. Following several rounds of amendments to address SEC comments, SunCar filed a fourth amendment to the Form F-4 on March 27, 2023. *Id.* The SEC declared the Form F-4 effective on March 30, 2023. *Id.* ¶ 46. The Form F-4 did not register the Warrant Shares.

The business combination was completed on May 17, 2023, "with SunCar remaining as the surviving publicly-traded company." Pl.'s 56.1 ¶¶ 146–53. Following the close of the business combination, the warrants' issuer changed from Goldenbridge to SunCar. *See* Warrant Agreement § 4.5 (stating that, in the event of a business combination, registered holders of the warrants "shall thereafter gave the right to purchase and receive, upon the basis and upon the terms and conditions specified in the Warrant Agreement . . . , the kind and amount of shares of stock . . . that the Registered Holder would have received if such Registered Holder has exercised his, her or its Warrant(s) immediately prior to such event"). On May 18, 2023, the day after the completion of the de-SPAC merger, SunCar retained Pryor Cashman to assist with its SEC filing obligations. Def.'s 56.1 ¶ 13.

### 5.  SunCar Blocks Alta from Exercising Its Warrants

On May 25, 2023, Alta attempted to exercise 40,000 of the warrants that it held. Def.'s 56.1 ¶ 102. And on May 31, 2023, Alta attempted to exercise another 100,000 of its warrants. *Id.* ¶ 103. Ms. Chen rejected both Alta's May 25 and May 31, 2023 exercise attempts, writing that "the warrants cannot be exercised until an effective statement on Form F-1 is available." *Id.* ¶ 104.

### 6.  SunCar Files a Form F-1

SunCar hired Marcum Asia ("Marcum") to prepare the audit of its 2022 financials. On February 9, 2023, SunCar contacted Marcum requesting that it "prepare the Dec 31, 2022 audited

financials as soon as possible" in anticipation of filing its Form F-1.[11]  *Id.* ¶ 64.  Marcum indicated

that the 2022 financials would not be ready until the end of March 2023 at the earliest.  *Id.*  Months

passed, during which SunCar did not follow up with Marcum to check on its progress.  On May 26,

2023, one-week after the de-SPAC transaction, Mr. Du, SunCar's CFO, traveled to China to meet

with Marcum to discuss the delinquent audit.  *Id.* ¶ 67.  Having not received the audited financials,

SunCar fired Marcum in early June 2023.  *Id.* ¶ 69.  Three days later, SunCar hired a new auditor,

Enrome.  *Id.*  By June 30, 2023, Enrome had prepared the 2022 financials.  *Id.* ¶ 72.  SunCar filed its

Form 20-FR that same day.  *Id.* ¶ 85.  On July 14, 2023, SunCar filed the form 20-F.  *Id.* ¶ 86.  And

on July 17, 2023, SunCar filed a Form F-1 for the "GEM Warrants."  *Id.* ¶ 87.

Pryor Cashman was responsible for preparing and drafting the Form F-1 and it kept

contemporaneous time records for all work completed on behalf of SunCar with respect to the

preparation for and drafting of SunCar's Form F-1.  Pl.'s 56.1 ¶¶ 194–95.  Pryor Cashman issued

only one invoice for any work its attorneys completed that was explicitly billed to the Form F-1

matter; that sole Form F-1 invoice covered the period from May 4, 2023 to July 31, 2023.  *Id.* ¶ 196;

Dkt. No. 105-6.  That invoice—the only invoice where any work by Pryor Cashman attorneys was

directly billed to the Form F-1 matter[12]—shows that Pryor Cashman billed a total of just 9.18 hours

to the Form F-1 matter during the two-month period following the completion of the business

---

[11] Alta contends that "SunCar did not need the 2022 financial statements to file the Form F-1 registering the Warrant Shares prior to June 30, 2023," because item 4(b) of the Form F-1 only requires that "the last year of audited financial statements may not be older than 15 months at the time of the offering or listing," subject to an extension to eighteen months for offerings of "securities upon the conversion of outstanding convertible securities or upon the exercise of outstanding transferable warrants."  Opp'n at 18 (citing and quoting Forn F-1 at 7; Form 20-F at 32–33, 89, 92 & Item 17).  As a result, Alta argues that the Form F-1 "could have been filed up to and including June 30, 2023 . . . without including 2022 audited financial statements."  Opp'n at 18–22.  Whether the Form F-1 required that SunCar submit its audited 2022 financial statements is a question of law and not a question of fact.  The parties' belief about the requirement is a question of fact.

[12] The parties dispute whether SunCar made efforts prior to July 2023 to prepare and draft the Form F-1 to register the Warrant Shares.  Pl.'s 56.1 ¶ 73.  Specifically, the parties disagree as to whether "much of the work essential to the F-1 had begun prior to the de-SPAC."  Alta contends that "SunCar . . . made no efforts to prepare [or] draft the Form F-1 until July 2023."  *Id.*  SunCar asserts that work on the Form F-1 had begun much earlier because other filings like the Form F-4 "laid a foundation for the F-1 work significantly."  Def.'s 56.1 ¶¶ 74, 75 ("[W]ork that went into the 20-FR and 20-F were also recycled for the F-1 to maximize efficiency.").

combination, of which 6.1 hours "related to preparing and filing a Form 6-K with the SEC concerning the change of SunCar's auditor" from Marcum to Enrome.  Pl.'s 56.1 ¶ 202; Dkt. No. 105-6.  And Pryor Cashman did not begin drafting the Form F-1 for the Public Warrants until after it completed the GEM F-1.  Pl.'s 56.1 ¶ 73 ("SunCar and its counsel made no efforts to prepare and draft the Form F-1 until July 2023."), ¶ 89.  Using the GEM F-1 as a template, SunCar "redlined that filing into an F-1 for Alta's warrants and filed it on July 24, 2023."  Def.'s 56.1 ¶ 89.

On August 7, 2023, the SEC issued a comment letter with respect to the Form F-1.  *Id.* ¶ 90. SunCar resolved those comments and filed an amended form on August 9, 2023.  *Id.*  And on August 15, 2023, the day before the ninety-day cashless exercise deadline, the SEC declared SunCar's Form F-1 effective, registering both the warrants and Warrant Shares.  *Id.*

### B.  Procedural History

Alta commenced this action on September 8, 2023.  Dkt. No. 1.  On September 10, 2024, Alta filed an amended complaint—the operative complaint in this case.  *See generally* AC.  In the AC, Alta alleged that SunCar breached the Warrant Agreement by forbidding "Alta and other holders to exercise their Public Warrants on or after May 17, 2023," *id.* ¶ 63, and by failing "to act in good faith to register the Warrant Shares in a timely fashion . . . [and] to keep the prospectus relating to the Warrant Shares current," *id.* ¶ 72.

On September 20, 2024, SunCar filed a motion to dismiss Alta's first breach of contract claim—that SunCar breached the Warrant Agreement by preventing exercise of the Public Warrants—pursuant to Fed. R. Civ. P. 12(b)(6).  On March 4, 2025, the Court granted SunCar's motion to dismiss Alta's first breach of contract claim.  *See generally* Dkt. No. 74 ("MTD Op.").  The Court granted the motion as to Alta's first breach of contract claim, which was premised on the allegations that SunCar's Form F-4 had registered the Warrant Shares, because the Court concluded that the Form F-4 "failed to effectively register the Warrant Shares."  *Id.* at 8.  Because the Court

held that the Form F-4 did not register the Warrant Shares, the Court concluded that Alta had not pleaded a breach of the cash exercise provision of the Warrant Agreement. *Id.*

Following the Court's decision granting SunCar's motion to dismiss, this case proceeded to discovery, which concluded on September 8, 2025. Dkt. No. 88. On October 16, 2025, SunCar filed a motion for summary judgment. *See* Dkt. No. 100 ("Mem."); Def.'s 56.1. On November 20, 2025, Alta filed its opposition. *See* Dkt. No. 104 ("Opp'n"); Pl.'s 56.1. And on December 18, 2025, SunCar replied. Dkt. No. 108 ("Reply"); Dkt. No. 110.

## III.    LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). The movant must "identify[] each claim or defense—or the part of each claim or defense—on which" it seeks summary judgment. Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If the movant carries that initial burden, the burden "shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim." *Id.* (citing *Celotex*, 477 U.S. at 323). To defeat a

motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court cannot "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

### B.  Breach of Contract and Contract Interpretation Under New York Law

The Warrant Agreement is governed by New York law. Warrant Agreement § 9.3. "To prevail on a breach-of-contract claim in New York, a plaintiff must prove: '(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quoting *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350–51 (2d Cir. 2005); then citing *Riccio v. Genworth Fin.*, 124 N.Y.S.3d 370, 372 (2020)). "When interpreting a contract, our

11

'primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (ellipsis omitted) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . ").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 864 F.3d at 99 (2d Cir. 2017) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Conversely, "[a] contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular

12

trade or business." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114). "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole."). But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). Rather, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (internal quotation marks omitted).

### C. "Best Efforts" Clauses

"New York law on best efforts clauses is far from clear."[13] *Cruz v. FXDirectDealer, LLC*, 720

---

[13] Some courts in this district have "treat[ed] the two terms ["reasonable efforts" and "best efforts"] interchangeably, suggesting that they each impose a similar performance obligation." *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 470 n.5 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (citing *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012)); *Monex Fin. Servs. Ltd. v. Nova Info. Sys., Inc.*, 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009); *Spencer-Smith v. Ehrlich*, No. 23-CV-02652, 2026 WL 305215 (S.D.N.Y. Feb. 5, 2026) ("New York courts construe a 'reasonable efforts' clause to impose similar obligations to a 'best efforts' standard.") (collecting cases). Other courts in this district however, have reached the opposite conclusion—that the "standard imposed by a reasonable efforts clause . . . is indisputably less stringent than that imposed by [a] 'best efforts] clause[]." *In re Chateaugay*

F.3d 115, 124 (2d Cir. 2013) (internal quotations omitted) (quoting *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 613 n.7 (2d Cir. 1979) (Friendly, J.)).[14]  There is no settled or universally accepted definition of "best efforts."  *Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 322 (S.D.N.Y. 2020) ("New York Courts are somewhat divided as to the precise meaning and application of a 'best efforts' obligation.").  Rather, "the verbal formulae that courts use when applying a 'best efforts' obligation often confuse rather than clarify and include such diverse definitions as 'due diligence,' 'all reasonable methods,' 'reasonable efforts,' 'good faith business judgment,' 'genuine effort,' and 'active exploitation in good faith.'"  *Holland Loader Co., LLC*, 313 F. Supp. 3d at 471 (quoting *Ashokan Water Servs., Inc. v. New Start, LLC*, 807 N.Y.S.2d 550, 553 (Civ. Ct. 2006) (citations omitted) (reviewing New York case law)).  In Judge Friendly's landmark opinion in *Bloor*, he concluded that a review of New York case law suggested that, at minimum, "a 'best efforts' clause imposes an obligation to act with good faith[15] in light of one's own capabilities."[16] *Bloor,* 601 F.2d at 613 n.7.  Judge Friendly's framing of the minimum obligation imposed by a best efforts clause, "persists today."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d at 124 (internal quotations omitted) (quoting *Bloor,* 601 F.2d at 613 n.7 (Friendly, J.)); *see, e.g.*, *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. United Tech. Corp.*, 230 F.3d 569, 578 (2d

---

*Corp.*, 198 B.R. 848, 854 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2d Cir. 1997); *Carl Zeiss Meditec, Inc. v. Insight Photonics Sols., Inc.*, No. 20-CV-7667, 2023 WL 8113657, at *8 (S.D.N.Y. Nov. 21, 2023) ("[T]he Court agrees that a contractual best efforts provision . . . is distinguishable from a 'commercially reasonable standard.'").

[14] Judge Friendly went on to note "and it is unfortunate that a federal court must have to apply it."  *Bloor,* 601 F.2d at 613 n.7.

[15] "[B]ecause the warranty to act in good faith inheres in every contract, the relationship between 'best efforts' and 'good faith,' 'fair dealing,' and 'reasonable care' remains unclear."  *Holland Loader Co., LLC*, 313 F. Supp. 3d at 471 (quoting *Ashokan Water Servs.*, 807 N.Y.S.2d at 553; then quoting *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1576 (2d Cir. 1994)); *see also Kroboth v. Brent*, 625 N.Y.S.2d 748, 749–50 (1995) ("Contrary to plaintiffs' contention, 'best efforts' requires more than 'good faith,' which is an implied covenant in all contracts . . . "Best efforts" requires that plaintiffs pursue all reasonable methods.").

[16] Judge Friendly adopted the word "capabilities" from the district court's decision, and as the district court noted, "'[c]apability,' . . . is a far broader term than 'financial ability.'  It includes the . . . expertise and experience attributable to the 'average, prudent, comparable' [actor in the relevant industry] . . . [and] must take into account [a defendant's] abilities and the opportunities which it created or faced."  *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 267 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979).

Cir. 2000); *Advanced Water Techs.*, 457 F. Supp. 3d at 322–23 (discussing Judge Friendly's articulation in *Bloor*); *Soroof Trading Dev. Co.*, 842 F. Supp. 2d at 511 (S.D.N.Y. 2012) (quoting *Monex Fin. Servs. Ltd.*, 657 F. Supp. 2d at 454).

Nonetheless, a promisor subject to a best efforts obligation retains "a degree of discretion," *W. Geophysical Co. of Am. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1171 (2d Cir. 1978), "within its good faith business judgment, in devising a strategy for achieving its ultimate goal." *In re Chateaugay Corp.*, 198 B.R. at 855 (citing *W. Geophysical Co. of Am.*, 584 F.2d at 1171). And a promisor "may [] give reasonable consideration to its own interests"—a promisor need not "spend itself into bankruptcy," nor need it accept "significantly lower profits, or [] losses" to fulfill a contractual best efforts obligation. *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 230 F.3d at 578 (quoting *Bloor,* 601 F.2d at 614). Suffice to say, at bottom, a "best efforts" obligation "requires that the promising party undertake at least some activity," *Holland Loader Co., LLC*, 313 F. Supp. 3d at 473—a promisor has not complied with a best efforts obligation when it "sit[s] on its hands" and "d[oes] nothing," or "g[ives] up . . . after a short time." *W. Geophysical Co. of Am.*, 584 F.2d at 1171.

As relevant to this motion, "determining whether a party used 'best efforts' under a contract 'almost invariably' is a question of fact that cannot be resolved at summary judgment," and only in the "rare case[] [is] failure to use best efforts [] ascertainable as a matter of law." *India Globalization Cap., Inc. v. Apogee Fin. Invs., Inc.*, No. 21-CV-1131, 2023 WL 4637551, at *9 (S.D.N.Y. July 20, 2023) (quoting *Kroboth*, 625 N.Y.S.2d at 750 (denying summary judgment on a breach of a best efforts obligation)); *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07 CIV. 376, 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008) (same); *US Airways Grp., Inc. v. Brit. Airways PLC*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997) (holding that whether a defendant breached a best efforts provision is a factual issue).

## IV.    DISCUSSION

### A.  The Best Efforts Clause Obligated SunCar to Commence Efforts to Register the Warrant Shares

At the outset, the Court must address a threshold question of contact interpretation—

whether, pursuant to the Best Efforts Clause, SunCar was obligated to use its best efforts to *file* a

registration statement registering the Warrant Shares within thirty days[17] following the completion of

the business combination, as Alta contends, or whether SunCar was only obligated to *commence* its

best efforts within thirty days, as SunCar contends.  The Best Efforts Clause's language is

unambiguous.  Under a plain reading of the Best Efforts Clause, SunCar was required to commence

its best efforts to effectuate filing of a registration statement registering the Warrant Shares "as soon

---

[17]    SunCar contends that Alta has adduced "no objective standard whatsoever" by which to judge whether it exercised best efforts.  Mem. at 19.  The Court disagrees.  As discussed in more detail below, the circumstances surrounding SunCar's efforts to register the Warrant Shares supply a standard against which to judge its efforts including, among other circumstances:  SunCar's two auditors which can be judged against each other, Pryor Cashman's research with respect to the registrability of the Warrant Shares on SunCar's Form F-4, and Loeb's own prior de-SPAC work.  And at least one benchmark is set forth in § 7.4 of the Warrant Agreement itself with respect to timing—that SunCar must commence best efforts "as soon as practicable but in no event later than thirty (30) business days" after the de-SPAC transaction.

In any event, while the Court need not and does not reach the issue, it observes that SunCar's argument invokes a higher standard than that which is required under New York law.  *Ashokan Water Servs., Inc.*, 807 N.Y.S.2d at 553 (collecting cases) (noting that courts will not enforce a "best efforts" clause that amounts to nothing more than an "agreement-to agree" but that "numerous courts, including the New York Court of Appeals . . . have applied an express 'best efforts' provision without articulated objective criteria.").  While "[s]ome New York state courts have required 'clear guidelines against which to measure' a party's efforts before they will enforce a "best efforts" clause . . . the New York Court of Appeals has not endorsed this requirement."  *Cruz*, 720 F.3d at 124 (internal citations omitted) (citing *Van Valkenburgh, Nooger & Neville, Inc.*, 30 N.Y.2d at 46–47).  Instead, other New York courts have invoked a "somewhat less stringent standard," concluding that "a best efforts clause is enforceable when 'external standards or circumstances impart a reasonable degree of certainty to the meaning of the phrase.'" *Id.* (quoting *Maestro W. Chelsea SPE LLC*, 954 N.Y.S.2d at 825; *see also Holland Loader Co.*, 313 F. Supp. 3d at 472 (noting that when "best efforts" is not defined by the contract, "courts . . . [have] require[d] that the party seeking to enforce the efforts provision establish" the standard "by which the breaching party's efforts are to be judged, in the context of the particular industry."); *Ashokan Water Servs., Inc.*, 807 N.Y.S.2d at 554 (noting that a best efforts obligation "will be enforced where sufficient content may otherwise be read into it against which the promisor's performance may be measured").  Here

Finally, the Court briefly notes that SunCar makes too much of the decision in *Pinnacle Books, Inc. v. Harlequin Enters. Ltd.,* 519 F. Supp. 118, 121 (S.D.N.Y. 1981).  *Pinnacle Books* does not stand for the proposition that all best efforts clauses are unenforceable absent "objective" benchmarks.  Rather, the court in *Pinnacle Books* expressly held that "it is possible to infer from the circumstances the standard of performance required by a 'best efforts' clause where the parties have agreed to work toward a specific goal."  *Id.* at 121–22.  The holding in *Pinnacle Books*—that the promisee needed to identify "express standards" against which to judge the promisor's efforts—was cabined to the particular facts of that case.  *Id.*  As the court explained, "[i]n the instant case, . . . the parties agreed only to negotiate," and "the very nature of contract negotiations renders it impossible to determine whether the parties have used their 'best' efforts to reach a new agreement" because "[w]hat each party offers or demands in the course of any negotiation is a matter left strictly to the business judgment of that party."  *Id.* at 122.

as practicable" but no later than thirty days after the completion of the de-SPAC merger; SunCar was not obligated to use its best efforts to complete the filing of a registration statement within that timeframe.

And the Best Efforts Clause's language imposed no deadline by which SunCar was obligated to complete the filing of a registration statement. In other words, "[b]est efforts were contemplated by the parties, results were not." *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 108 (2d Cir. 1985); *Success Acad. Charter Schs., Inc. v. Liberty Square Realty Corp.*, 229 N.Y.S.3d 133, 135 (2025) ("'[T]he 'best efforts' clause and the requirements for performance of its work are not subsumed in the completion of the work, but constitute independent obligations."); *Soroof Trading Dev. Co.*, 842 F. Supp. 2d at 511 ("Put differently, reasonable efforts to supply a product are not necessarily the same as actual success in supplying a product."); *Thompson v. Liquichimica of Am., Inc.*, 481 F. Supp. 365, 366 (S.D.N.Y. 1979).

As described above, the Best Efforts Clause provides—

Registration of Ordinary Shares. The Company agrees that as soon as practicable, but in no event later than thirty (30) business days after the closing of a Business Combination, it shall use its best efforts to file with the SEC a registration statement for the registration under the Act of the Ordinary Shares issuable upon exercise of the Warrants, and to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the Warrants in accordance with the provisions of this Agreement.

Warrant Agreement § 7.4. The natural reading of the Clause as written requires only commencement of best efforts to register the Warrant Shares "as soon as practicable" and within the thirty-day timeframe—not completion of the underlying obligation to actually register the warrant shares. Basic rules of grammar and sentence structure support this interpretation because the operative verb "shall" immediately precedes "use best efforts" and not "file." If the parties had intended to obligate SunCar to file the registration statement within thirty days, they could have drafted language to achieve that result, by, for example, providing that "SunCar shall use best efforts

17

to file with the SEC a registration statement no later than thirty (30) business days after the closing

of a Business Combination . . . ."  But the parties did not draft the Best Efforts Clause to impose a

thirty-day filing deadline.  To construe the Best Efforts Clause as imposing an obligation on SunCar

to use its best efforts to effectuate filing within thirty days would require that the Court rewrite the

parties' contract.  The Court will not do so—"[a] written agreement that is complete, clear and

unambiguous on its face must be enforced according to the clear meaning of its terms."  *Alta*

*Partners, LLC v. Getty Images Holdings, Inc.*, 165 F.4th 141, 150 (2d Cir. 2026) (internal quotations and

citations omitted); *Bank of N.Y. Mellon*, 2015 WL 2449313 at *2.

Second, in considering the Warrant Agreement "as a whole," interpreting the Best Efforts

Clause as obligating SunCar only to commence best efforts within thirty days after the de-SPAC

transaction accords with the other provisions of the contract.  *Brad H.*, 17 N.Y.3d at 185 ("[T]he

contract must be considered as a whole.").  An interpretation of the Best Efforts Clause as requiring

commencement of efforts within the applicable thirty-day window is the only reading that "give[s]

full meaning and effect to all of [the] provisions" of the Warrant Agreement.  *Orchard Hill*, 830 F.3d

at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295).  Because the Best

Efforts Clause repeats the conjunctive "and,"[18] it imposes three[19] distinct obligations on SunCar:  (1)

"to file with the SEC a registration statement . . . *and*"; (2) "to cause the [registration statement] to

---

[18] The plain and ordinary meaning of the word "and" is conjunctive.  *BOKF, N.A. v. Caesars Ent. Corp.*, 162 F. Supp. 3d 243, 246 n.5 (S.D.N.Y. 2016) (collecting cases).  The dictionary defines "and" as a "function word to indicate connection or addition."  *And*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/and?src=search-dict-box (last visited June 1, 2026); *AND*, Black's Law Dictionary (4th rev. ed. 1968) ("A conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first.").  As used in the Best Efforts Clause, "and" "is unambiguous and . . . has its usual conjunctive meaning." *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 725 (2d Cir. 2020) (summary order).  And while sometimes "and" can mean "or" in context, there is no indication here that the parties intended to use "and" disjunctively.  *In re Fairfield Sentry Ltd.*, 147 F.4th 136, 150 (2d Cir. 2025) (noting that courts determining whether "and" is used conjunctively or disjunctively look to the context in which the word is used, including how "and" is used elsewhere in the contract); *see also Pulsifer v. United States*, 601 U.S. 124 (2024).  Rather, the word "and" is repeatedly used conjunctively throughout the Warrant Agreement.  *See, e.g.*, Warrant Agreement § 3.3.2.

[19] Because the Best Efforts Clause provides "and to maintain the effectiveness of such registration statement, *and* a current prospectus relating thereto," it could be read to impose a fourth obligation as to maintaining the effectiveness of the prospectus.

become effective *and*"; (3) to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, . . . until the expiration of the Warrants in accordance with the provisions of this Agreement. Warrant Agreement § 7.4. The phrase "shall use best efforts" precedes all three of the conjoined obligations.[20] Because "best efforts" precedes all three conjoined obligations, the plain meaning of the Best Efforts Clause is that SunCar was obligated to use its best efforts with respect to all three obligations.

Importantly, interpreting the Best Efforts Clause to require filing within the thirty-day window would render the third obligation imposed by the Best Efforts Clause—that SunCar "maintain the effectiveness of [the] registration[21] statement . . . until the expiration of the Warrants"—ineffective because SunCar could not complete that obligation within thirty days. SunCar could not complete that third obligation within thirty days after the de-SPAC because Section 3.2 of the Warrant Agreement explicitly provides that the warrants do not expire until five years after the de-SPAC transaction. Warrant Agreement § 3.2. Because SunCar cannot complete a five-year long obligation within thirty days, the Clause can only be reasonably understood to require commencement of efforts within the specified timeframe. Accordingly, because an interpretation of

---

[20] The court in *Alta Partners, LLC v. Getty Images Holdings, Inc.*, 700 F. Supp. 3d 32, 36–37 (S.D.N.Y. 2023), *aff'd*, 165 F.4th 141 (2d Cir. 2026), concluded that the efforts clause at issue imposed a deadline for filing a registration statement registering the warrants and underlying shares. But the contractual language at issue in that case was different because it expressly imposed a filing deadline, followed by a separate sentence imposing an obligation to seek and maintain the registration's effectiveness. *Id.* at 36–37 ("Section 7.4 required 'that as soon as practicable, but in no event later than twenty (20) Business Days after the closing of its initial Business Combination, [the Company] shall use commercially reasonable efforts to file . . . a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants. In addition, '[t]he Company shall use commercially reasonable efforts to cause the same to become effective within sixty (60) Business Days after the closing of its initial Business Combination and to maintain a current prospectus relating thereto.'").

[21] And as SunCar contends, accepting Alta's construction of the Clause would also be problematic when read in light of the second obligation—that SunCar "cause the [registration statement] to become effective"—because the SEC, and not SunCar, decides when a registration statement is effective. True, SunCar "can help make [the review process] a little better by having the most complete, materially accurate materials submitted," but the SEC is still charged with determining if, and when, a registration is deemed effective. Opp'n at 14. As the Second Circuit has noted, "[d]ue to the nature of the securities business and the vagaries of the SEC, registration can never be guaranteed, [and] in the usual case a "best efforts" clause is as close to a guarantee of registration as any careful seller is willing to give." *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 896 (2d Cir. 1976).

the Best Efforts Clause as setting a timeline for commencement of efforts "give[s] full meaning and effect to all of [the] provisions" of the Warrant Agreement, the Best Efforts Clause was unambiguous and did not impose an obligation on SunCar to file a registration statement no later than thirty days after the de-SPAC transaction. *Orchard Hill*, 830 F.3d at 157 (internal quotations and citations omitted). In sum, the Best Efforts Clause obligated SunCar to commence the application of best efforts to file a registration statement registering the Warrant Shares within thirty days after the completion of the business combination.

### B. There is a Genuine Dispute of Material Fact as to Whether SunCar's Conduct in Filing the Form F-4 and Form F-1 Met its "Best Efforts" Obligation

The central issue in this case is whether SunCar used best efforts to file a registration statement registering the Warrant Shares. This is not one of those "rare cases" where SunCar's breach of the best efforts obligation is ascertainable as a matter of law because a reasonable jury could find for Alta on these facts. *India Globalization Cap., Inc.*, 2023 WL 4637551 at *9. Accordingly, summary judgment is inappropriate because Alta raises a genuine dispute of material fact regarding whether SunCar's conduct in filing a registration statement registering the Warrant Shares was sufficient to satisfy its best efforts obligation. SunCar's arguments to the contrary all raise disputes of fact.

Alta contends that SunCar conduct did not meet its best efforts obligation in two ways, namely that: (1) SunCar did not use best efforts with respect to determining whether to register the Warrant Shares on the Form F-4; and (2) SunCar did not use best efforts when preparing and filing the Form F-1.[22] The Court addresses each argument in turn.

---

[22]     SunCar argues that Alta's "'could have' liability theory fails as a matter of law because . . . '[a] court's evaluation of party's compliance with a "commercially reasonable efforts" requirement does not involve a hindsight comparison of the party's actual conduct to that which could have been undertaken to produce a better result; a court should evaluate only whether the party's actual conduct was sufficient.'" Mem. at 19 (quoting *Holland Loader Co., LLC*, 313 F. Supp. 3d at 472–73). Suncar's argument is not persuasive on the facts of this case. Here, Alta's theory is not based on a hindsight comparison—Alta asks only that a jury "evaluate whether SunCar's actual conduct—its decision not the register on the

### 1.    The Form F-4

First, a reasonable jury could find that SunCar's efforts to register the Warrant Shares on the Form F-4 were insufficient to satisfy its best efforts obligation.  At the outset, SunCar is simply "incorrect that the instructions to the S-4 prohibit using the form to register the issuance and sale of the warrant shares."[23]  *Alta Partners, LLC*, 700 F. Supp. 3d at 43.  A Form F-4 "may be used for the offering of securities pursuant to Rule 415(1)(viii)."  *Alta Partners, LLC*, 165 F.4th at 151 (concluding that the district court "correctly rejected [defendant's] argument" that the Form F-1 was "required to register the issuance and sale" of warrant shares because the warrant shares could not have been registered on the Form F-4).  "Rule 415(1)(viii), in turn, permits securities to 'be registered for an offering to be made on a continuous or delayed basis in the future' if '[t]he registration statement pertains only to . . . [s]ecurities which are to be issued in connection with business combination transactions.'"  *Id.*  (quoting 17 C.F.R. § 230.415(a)(1)(viii)).

Here, "the de-SPAC process that created the publicly-traded" SunCar "was a 'business combination" within the meaning of 17 C.F.R. § 230.415(a)(1)(viii).  *Id.*  And because "[t]he warrants

---

Form F-4 and then to delay filing the Form F-1—was sufficient to satisfy the 'best efforts' standard."  Opp'n at 24 (citation modified).

     And SunCar's argument that Alta's theory of breach would require the Court to engage in hindsight analysis makes too much of the Court's language in *Holland Loader*—when a finder of fact puts a promisor's actual conduct at the time of the purported breach under a microscope to determine whether that conduct was sufficient to satisfy a best efforts obligation, the finder of fact will also necessarily determine whether the promisor could and should have acted differently *at that time*.  Such a determination is not a "hindsight comparison."  *See e.g.*, *Marx & Co.*, 550 F.2d 505, 508 (2d Cir. 1977) (Plaintiffs contended that Diners *should have* filed [its registration statement] on or about. . . ." (emphasis added)).  Accepting SunCar's proffered interpretation of the "hindsight" language in *Holland Loader* on this record would lead to absurd results—if for instance, the factfinder were to conclude that a promisor breached a best efforts obligation because it undertook literally zero efforts, the logical outgrowth of that conclusion is that the promisor could have, and should have, done something (presumably, anything) more.  Under SunCar's proffered reading of *Holland Loader*, the factfinder in that circumstance would be engaging in improper hindsight comparison.  That cannot be the case.

[23] As noted above, it is for the Court to decide as a matter of law whether the Warrant Shares at issue could have been registered on the Form F-4 and whether the warrants were issued or convertible "in connection with" the business combination under the Form F-4's instructional language and relevant guidance documents.  The Court, not a factfinder, determines the "legal effect" of a legal document.  *Cf. Liang*, 2013 WL 5366394 at *5, *aff'd sub nom. Liang*, 764 F. App'x 103 (2d Cir. 2019).  Whether the Form F-4 permits registration of the warrants is "a matter of statutory interpretation, rather than a matter of analyzing a factual record."  *Securities and Exch. Comm'n*, 2025 WL 40782 at *7; *Alta Partners, LLC*, 165 F.4th at 151 (concluding "as a matter of law" that the Form F-4 allowed for registration of de-SPAC warrant shares).

could only be exercised, and warrant shares issued, after the business combination closed," they were "issued in connection with [the] business combination." *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (noting that the phrase "in connection with" is to be construed broadly in securities law)).[24]  Accordingly, the Form F-4 permitted registration of the warrants and the Warrant Shares at issue in this case.

A reasonable jury could find for Alta on this record.  On this record, a reasonable jury could conclude that SunCar did not use best efforts because a jury could find that SunCar's counsel's[25] decision to not register the Warrant Shares on the Form F-4—made without conducting additional research, without consulting knowledgeable colleagues, and without consulting or advising SunCar—did not satisfy SunCar's obligation to use best efforts.  *Carl Zeiss Meditec, Inc.*, 2023 WL 8113657 at *7 (holding that a reasonable trier of fact could conclude that "Defendant did not use its best efforts . . . by failing to devote sufficient resources and effort to complete the development work").  The first draft of the Form F-4 prepared by Pryor Cashman would have registered the Warrant Shares.  Def.'s 56.1 ¶ 45.  But Mr. Caruso subsequently revised the fee table, and the effective Form F-4 did not register the Warrant Shares.  *Id.* ¶ 26.  The parties dispute why Mr.

---

[24] Alta asserts that "SEC guidance required SunCar," to register the warrants on the Form F-4, Opp'n at 21, citing SEC guidance which states that "[w]here the offer and sale of convertible securities or warrants are being registered under the Securities Act, and such securities are convertible or exercisable within one year, [] the underlying securities [must] be registered at that time."  SEC Division of Corporate Finance, Compliance and Disclosure Interpretations, Securities Act Sections, Section 139. Securities Act Section 5, Q. 139.01 (Aug. 14, 2009).  Here, the Form F-4 was filed before the completion of the business combination.  This case is distinguishable from *Alta Partners, LLC*, 165 F.4th at 151, for this reason because as this Court noted—it was not necessarily the case that the Public Warrants were convertible or exercisable within one year of the filing of the Form F-4.  Thus, the Public Warrants may have been convertible or exercisable within one year, but they also may not have been, contingent on the date of the business combination and IPO.  MTD Op. at 11 n.4.

[25] "Normally the conduct of an attorney is imputed to his client, for allowing a party to evade 'the consequences of the acts or omissions of [] his freely selected agent' 'would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.'"  *S.E.C. v. McNulty*, 137 F.3d 732, 739 (2d Cir. 1998) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 633–34 (1962)); *Holland v. Florida*, 560 U.S. 631, 664 (2010) (Scalia, J., dissenting) ("Because the attorney is the litigant's agent, the attorney's acts (or failures to act) within the scope of the representation are treated as those of his client.").  Accordingly, the conduct of SunCar's attorneys is attributable to SunCar.  SunCar concedes as much—that "it undisputedly relied on and *acted through* counsel."  Reply at 4 (emphasis added).  And the fact that SunCar delegated certain responsibilities to counsel (and, as discussed below, to its auditor) who SunCar believed to be competent is a question of fact.  A jury need not conclude that SunCar's reliance on its attorneys was reasonable on this record.

Caruso decided to revise the fee table and whether that decision reflected best efforts.  Pl.'s 56.1 ¶¶ 25–27 (disputing whether revisions to the Fee Table were "deliberate or simply an error.").

SunCar contends that, as Mr. Caruso testified, he decided not to register the Warrant Shares on the F-4 because "he read the instructions on the F-4 Form to be 'clear' that post-de-SPAC warrant exercise was 'not specifically permitted' on the F-4."[26]  Def.'s 56.1 ¶ 27.  Other evidence in this record however undermines Mr. Caruso's testimony—Mr. Caruso did not discuss with Goldenbridge his views as to whether the Warrant Shares were properly registerable on the Form F-4 before Mr. Caruso revised the fee table.  Pl.'s 56.1 ¶ 156; Dkt. No. 103-11 at 35:21–36:18 (Mr. Caruso stating that he did not provide any legal advice to Goldenbridge as to whether a Form F-4 could have been used to register the Warrant Shares), 44:7–18 (Mr. Caruso responding that he "did not" give any consideration to registering the warrants or the Warrant shares on the Form F-4).  Nor did Mr. Caruso conduct additional research into whether the Form F-4 permitted such registration, consult with any other Loeb attorneys, or even review his previous Form F-4 filings from other matters before deciding the Warrant Shares could not be so registered.  Dkt. No. 103-11 at 45:3–48 ("Q:  Did you do any legal research into whether the shares issuable upon exercise of the public warrants could be exercised on this Form F-4 other than reviewing the instruction?  Mr. Caruso:  As the instructions were clear, no.").  It is an issue of fact for the jury whether to credit Mr. Caruso's testimony that he believed that SunCar's Warrant Shares could not be registered on the Form F-4.

And as Alta contends, in at least seven other de-SPAC transactions,[27] Mr. Caruso, Mr. Nussbaum, and Ms. Bai—Loeb attorneys who worked on or supervised the SunCar de-SPAC

---

[26] Instead, as Mr. Caruso testified, his belief was that "the F-4 only permits the registration of securities issued in connection with the business combination," and because he did not view the warrants at issue as "issued in connection with the business combination," given that the warrants could only be exercised after the de-SPAC transaction, he concluded that they were not registrable on the Form F-4.  Def.'s 56.1 ¶¶ 28, 30.

[27] As noted above, Alta contends that registering warrants on a Form F-4 is commonplace in de-SPAC transactions, a fact which Loeb's attorneys "were well aware" of because they had worked on other de-SPAC transactions in the past.  Pl.'s 56.1 ¶ 27.

transaction—had registered or attempted to register warrant shares on a Form F-4 for other issuers. Opp'n at 16.  As a result, SunCar's counsel's own conduct in those other de-SPAC transactions provides a benchmark against which to measure its conduct with respect to the preparation of the Form F-4 here.  SunCar's various arguments[28] that those previous transactions are not relevant raise factual disputes inappropriate for resolution for summary judgment.

Whether SunCar's counsel's conduct in preparing the Form F-4 reflected, at minimum, an "active," good faith effort to use best efforts—given that Mr. Caruso "did nothing," to confirm his purported understanding of the Form F-4—is a question of fact for the jury.  *W. Geophysical Co. of Am.*, 584 F.2d at 1171; *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO*, 230 F.3d at 578 ("Based on cases interpreting 'best efforts' . . . we think [a defendant] must 'actively' and 'in good faith' pursue the goal . . ." (citation omitted)).  Because a reasonable jury could conclude that SunCar's efforts with respect to the Form F-4 were insufficient to satisfy its best efforts obligation, and that Mr. Caruso's testimony is nothing more than a "post-hoc invented-for-litigation excuse for failing to register the issuance of the Warrant Shares upon exercise of the Warrants on the Form F-4," Pl.'s 56.1 ¶ 27, summary judgment is not warranted.

### 2. The Form F-1

And a reasonable jury could conclude that SunCar's efforts to register the Warrant Shares on the Form F-1 registration statement were insufficient to satisfy its best efforts obligation.  First, a reasonable jury could find that SunCar failed to make any efforts, much less best efforts to advance the 2022 audit, which SunCar contends was a necessary prerequisite to filing the Form F-1.  In sum

---

[28] For instance, SunCar contends that "Alta offers no context or background for those other transactions and no evidence that they resembled SunCar's circumstances."  Reply at 4.  And SunCar also contends that only one of the seven other de-SPAC transactions "unmistakably registered [the] post-exercise issuance of warrant shares, suggesting the rest are more equivocal."  *Id.*  A reasonable jury could conclude that Loeb's conduct here in light of its other de-SPAC transactions did not meets its efforts obligation.  SunCar's arguments to the contrary all raise factual issues.

and substance, SunCar blames its auditor[29] for any delay in filing the F-1.  Mem. at 7–8 ("[T]he audit was severely delayed as of May 2023 . . . [and] concerns over Marcum's ability to perform were compounded when SunCar learned of an SEC investigation into Marcum's SPAC-related audit practices.").  But SunCar does not dispute that it is responsible for its auditor (or that it is responsible for the selection of its auditor)—and a reasonable jury could conclude that SunCar's conduct in following up with the delinquent auditor and SunCar's conduct in relying on the delinquent auditor did not meet its best efforts obligation.  *Republic Tech. Fund, Inc. v. Lionel Corp.*, 483 F.2d 540, 553 (2d Cir. 1973) (holding that the district court erred in concluding that the facts could not support a finding that the defendant breached a best efforts obligation to file a registration statement given "the accountants' unwillingness to certify the necessary financial statements" because any "unwillingness" could have been "precipitated or contributed to by" the defendant's own conduct").

On the record here, a reasonable finder of fact could conclude that SunCar merely "s[a]t on its hands" because it did not follow up with its auditor in a timely manner.  *W. Geophysical Co. of Am.*, 584 F.2d at 1171.  The parties do not dispute that SunCar did not contact its auditor to request that the auditor begin preparing the 2022 financial statements until February 9, 2023.  Def.'s 56.1 ¶ 64.  In the months following its initial request, the record does not indicate that SunCar did anything to follow up with its auditor to ensure timely completion of the 2022 audit.  Dkt. No. 103-6 at 109:19–111:8 (Ms. Chen testified that she could "not remember" whether she had "interface[d] at all with

---

[29] SunCar also asserts that it "faced immediate, overlapping deadlines" to file its Form 20-F annual report, its post-merger Form 20-FR report, and the Form F-1.  Mem. at 7.  And it contends that because the deadline for the Form 20-F had already elapsed and because the deadline for the Form 20-FR was only six days away, SunCar reasonably prioritized those filings.  *Id.*  SunCar's argument as to the sequence of its obligations also raise issues of fact inappropriate for summary judgment resolution.  *Marx & Co.*, 550 F.2d at 508 (concluding that there that there was sufficient evidence to support a jury verdict that the defendant had breached its best efforts obligation despite the "monumental problems" defendants faced "in causing the registration statement to become effective" and even though it resolved the SEC's comments on the registration within two weeks of receiving the comments).  Even if, as SunCar contends, the filings had to completed in a particular sequence, a reasonable jury could nonetheless conclude that SunCar did not use best efforts in how quickly it worked to meet and complete the sequential filing obligations.

SunCar's auditors" and did "not know" why the original auditor was dismissed).  It was not until one week after the de-SPAC transaction—three months after the (first) and last time SunCar had contacted its auditor—that SunCar's CFO, Mr. Du, flew to China to meet with the auditor to demand that the audit be sped up, and even then SunCar only requested that the audit be completed no later than June 23, 2023.  Def.'s 56.1 ¶ 67; Dkt. No. 103-10 at 59:13–60:13.  Because the record does not reveal that SunCar followed up with the auditor beyond its CFO's single trip, the finder of fact could conclude that "[t]his [was] not 'best efforts.'"  *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. at 270.  Accordingly, on this record, a reasonable jury could find that SunCar's efforts to follow up with the auditor to ensure that the audit was completed in a timely manner were not sufficient to meet its best efforts obligation.

SunCar fired Marcum in early June.  Def.'s 56.1 ¶ 69.  Three days later, it hired a new auditor.  *Id.*  The new auditor completed the 2022 audited financial statements on June 30, 2023—less than a month after it was hired.  *Id.* ¶ 72.  The time within which the new auditor was able to provide the 2022 audited financial statements provides "sufficient content . . . against which" the jury may measure SunCar's efforts with respect to its first auditor.  *Ashokan Water Servs., Inc.*, 807 N.Y.S.2d at 554.  On this record, reasonable jury could find that SunCar's conduct with respect to ensuring completion of the 2022 audits was unreasonable and not sufficient to meet its best efforts obligations when measured against the second auditor's conduct.  Accordingly, a reasonable jury could conclude that SunCar did not undertake best efforts to effectuate filing of the Form F-1 because it failed to take reasonable steps to advance the 2022 audit.

Second, summary judgment is not warranted because a reasonable jury could find for Alta that SunCar's attorneys did not dedicate sufficient time and unreasonably delayed their efforts to begin preparing the Form F-1 registration statement to register the Warrant Shares after the de-SPAC transaction.  On this record, a reasonable jury could conclude that SunCar did not use best

efforts to effectuate filing the Form F-1 to register the Warrant Shares because Pyror Cashman's billing records reflect less than ten hours of work billed directly to its Form F-1 matter. Pryor Cashman kept contemporaneous time records for all work completed on behalf of SunCar. Pl.'s 56.1 ¶ 196. Pryor Cashman issued only one invoice for all the work its attorneys completed that was explicitly billed to the Form F-1 matter; that sole Form F-1 invoice covered the period from May 4, 2023 to July 31, 2023. Pl.'s 56.1 ¶ 196; Dkt. No. 105-6. That invoice—the only invoice where any work by Pryor Cashman attorneys was explicitly billed to the Form F-1 matter—shows that Pryor Cashman billed a total of just 9.18 hours to the Form F-1 matter during the two-month period following the completion of the business combination, of which 6.1 hours "related to preparing and filing a Form 6-K with the SEC concerning the change of SunCar's auditor." Pl.'s 56.1 ¶ 202; Dkt. No. 105-6. SunCar contends that the Form F-1 invoices are not the only invoices that reflect Pryor Cashman's work on the Form F-1 because "work such as the changing of the auditor, preparation of the prior year audit, and filing Forms 20-F and 20-FR, are all integral to the work on the Form F-1 for the Public Warrants, despite being billed under separate matter numbers." Dkt. No. 110 ¶ 197. But SunCar's contention that any preparatory work billed to other matters should be counted as work on SunCar's Form F-1 is a classic question of fact inappropriate for resolution on summary judgment.

Pryor Cashman also issued[30] an invoice covering its work billed to the business combination matter during the period from June 21, 2022 to April 30, 2023.[31] Pl.'s 56.1 ¶ 199. "None of the work reflected on that invoice concerned the preparation or filing of a Form F-1 for the public

---

[30] Pryor Cashman also issued two additional invoices for its work involving "SEC Reports & General Matters." Pl.'s 56.1 ¶ 201. The parties' arguments with respect to these invoices mirror their arguments with respect to the other invoices not explicitly billed to the Form F-1 matter.

[31] And while Pyror Cashman issued two invoices for work billed to the "Public Warrants" matter—"those invoices related solely to work performed with respect to SunCar's dispute with Alta and not to the preparation of a Form F-1." Pl.'s 56.1 ¶ 200.

warrants." *Id.* Here too, SunCar contends that because work completed on the de-SPAC transaction, the 20-F, and the 20-FR "are all integral to the work on the Form F-1," or are "predicate[s]" to the filing of the Form F-1," that work should constitute efforts undertaken to effectuate filing of the Form F-1, even if that work was billed under different matters. Dkt. No. 110 ¶¶ 195–99. On this record however, a reasonable jury could conclude otherwise—that SunCar's counsel made minimal efforts to effectuate filing of the Form F-1 because it spent less than ten hours working on that matter directly irrespective of any "predicate" work it may have completed. And again whether any "predicate" work should also constitute work on the Form F-1 is a question for the factfinder. Accordingly, a reasonable fact finder could conclude that SunCar's efforts to effectuate filing of the Form F-1 did not fulfill its obligation under the Best Efforts Clause.

In sum, irrespective of whether SunCar engaged in some efforts to, and ultimately did, register the Warrant Shares, "there is a factual question as to whether it exerted its best efforts to do so." *Full Circle United, LLC v. Bay Tek Ent., Inc.*, No. 20-CV-03395, 2024 WL 5691659 (E.D.N.Y. Sept. 23, 2024).

### C. Alta's Damages

Summary judgment is not warranted because Alta has raised a plausible claim for nominal damages. "It is 'fundamental' under New York law, that 'damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.'" *Alta Partners, LLC*, 165 F.4th at 156 (internal citations omitted) (quoting *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990); then quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003)). "Along these lines, 'a non-breaching party is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty.'" *Id.* (quoting *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016)).

It is well-settled that "'[c]ertainty," as it pertains to general damages, refers to the fact of damage, not the amount." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007); *W. Geophysical Co. of Am.*, 584 F.2d 1173 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). This is because "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain." *Tractebel Energy Mktg.*, 487 F.3d at 111 (internal quotations omitted) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205 (1886)). Accordingly, "where 'the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer.'" *Alta Partners, LLC*, 165 F.4th at 156 (emphasis in original) (quoting *Process Am., Inc.*, 839 F.3d at 141). "Doubts are generally resolved against the party in breach." *Process Am., Inc.*, 839 F.3d at 141.

"It is also a 'fundamental proposition' under New York law 'that the loss caused by a breach is determined as of the time of breach.'" *Id.* (quoting *Sharma*, 916 F.2d at 825 (collecting cases); then citing *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971)). And "where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." *Id.* (internal citations and quotations omitted). "For publicly traded stocks, like the warrant shares here, the market value is 'the mean between the highest and lowest quoted selling prices, as provided by the public exchange upon which the stock traded' at the time of the breach." *Alta Partners, LLC*, 165 F.4th at 156 (quoting *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 385 (2d Cir. 2006)).

Here, SunCar is not entitled to summary judgment on the basis of Alta's damages theory because even if Alta's actual damages were, as SunCar "argue[s] too 'speculative' to support its claims, [it] would [still] have plausible claims for nominal damages," as "nominal damages are always available in breach of contract actions." *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische*

*Industrie*, 784 F.3d 78, 87 (2d Cir. 2015); *see also Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 247 n.10 (2d Cir. 2020) (holding that the argument that the court need only "address the district court's damages ruling [on summary judgment] and stop there" was "mistaken" because under New York law, "nominal damages are always available in a breach of contract action"). "A defendant is only entitled to summary judgment as to a lack of damages if the plaintiff has failed to raise a genuine issue of material fact 'as to the existence of alleged damages, including nominal damages.'" *India Globalization Cap.*, 2023 WL 4637551 at \*5, \*7 (quoting *N.Y.C. Transit Auth. v. Express Scripts, Inc.*, No. 19-CV-5196, 2022 WL 3577426, at \*3 (S.D.N.Y. Aug. 19, 2022)) ("ICG cannot prevail at summary judgment because it has failed to address whether, even if there were no actual damages, Apogee would be entitled to nominal damages resulting from the alleged breach."); *Tradex Europe SPRL v. Conair Corp.*, 2008 WL 1990464, at \*5 (S.D.N.Y. 2008) (same). Because Alta is entitled to nominal damages should the jury conclude that SunCar efforts were insufficient to meet its best efforts obligation, summary judgment is not warranted.

And while the Court need not reach SunCar's arguments about the sufficiency of Alta's proof with respect to actual damages because of the availability of nominal damages, the Court pauses to question whether SunCar's suggestion that Alta need prove the date of exercise with reasonable certainty is proper on the particular facts of this case. SunCar contends that Alta's damages theory is purely speculative—that "Alta cannot establish [damages], with anything beyond conjecture, much less 'reasonable certainty,'" because the date on which Alta would have exercised is hypothetical.[32] Mem. at 24. SunCar argues that *Alta Partners, LLC*, 165 F.4th at 156, and *Tang Cap.*

---

[32] There is no merit to SunCar's contention that Alta must prove that it would have, after exercise, sold the underlying Warrant Shares. "Under New York law, 'it is appropriate to assess damages for breach of contract based on a failure to issue a warrant or a failure to honor a warrant by comparing the warrant's strike price to the market price of the stock on the date of attempted exercise." *Iroquois Master Fund Ltd.*, 2014 WL 2800752 at \*1. The Second Circuit has affirmed this methodology for calculating damages for a breach of contract that results in the inability to exercise warrants. *Alta Partners, LLC*, 165 F.4th at 156 (affirming district court's calculation of damages "by comparing the warrant strike price, $11.50 per warrant, with the mean stock trading price of the Getty shares on those dates and multiplied that figure by the number of warrants that Alta and CRCM would have exercised but for Getty's breach."); *Oscar Gruss & Son, Inc. v.*

*Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 397 (S.D.N.Y. 2024), are distinguishable because in those cases, the "courts determined that the warrant shares were registered and exercisable as of a specific date[, accordingly,] [t]he dates of breach were [] self-evidently the dates on which Alta or Tang attempted actual exercise thereafter and was refused." *Id.* at 24.

SunCar's arguments appear to be based on a modest mutation of the general rule that damages are determined at the time of breach—SunCar grafts onto that rule the manner in which it is applied in cases involving a failure to deliver warrant shares upon exercise. As a result, SunCar argues that Alta must prove both the failure to use best efforts and the failure to deliver the Warrant Shares upon proper exercise. *See Alta Partners, LLC*, 700 F. Supp. 3d at 44 (asserting that "under New York law, 'the measure of damages' *for failing to deliver a stock* in accordance with an option or warrant agreement 'is the difference between the option price and the market value of the stock.'" (emphasis added)). This is likely a scenario that presents itself frequently in breach of contract cases involving warrants. But the alleged breach here is not the refusal to issue shares upon a proper exercise. Rather, the alleged breach is the failure to use best efforts.

SunCar's arguments appear to compress the two theories of breach—the failure to deliver shares or permit exercise and the failure to use best efforts. The two theories of breach are not the same—as SunCar acknowledges, where the breach is the failure to deliver warrant shares, damages are calculated from the date of attempted exercise. *Alta Partners, LLC*, 165 F.4th at 156; *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d at 397. By contrast, where, like here, the breach is the failure to use best efforts, under the general rule damages are calculated from the date on which the jury determines that SunCar failed to use best efforts. The Court need not resolve this issue here, so it does not. But the parties should bear in mind that opinions applying a general rule to specific

---

*Hollander*, 337 F.3d 186, 197 (2d Cir. 2003) ("Based on clear New York law, the proper valuation for the warrants was the date of the breach.").

facts do not convert those facts into part of the rule. *See, e.g.*, *Green v. Town of E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020) ("The district court's transmutation of the facts . . . into a substantive controlling principle . . . imposed a legal standard at an unwarranted level of specificity.").

In sum, Alta has "show[n] a 'stable foundation for a reasonable estimate' of the damages incurred as a result of the [purported] breach.'" *Process Am., Inc.*, 839 F.3d at 141. On summary judgment, that is enough.

## V.     CONCLUSION

For the reasons stated above, SunCar's motion for summary judgment is DENIED. The Clerk of Court is directed to terminate the motions pending at Dkt. No. 100 and Dkt. No. 102.

SO ORDERED.

Dated: June 2, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge

32